# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    Plaintiff,

  v.        Case No. 20-CR-56

ANTONIO L. STEWART,

    Defendant.

## RECOMMENDATIONS AND ORDERS ON THE DEFENDANT'S PRETRIAL MOTIONS

### 1. Introduction

Antonio L. Stewart is charged with possession of marijuana with intent to distribute, possession of a firearm in furtherance of a drug trafficking offense, and possession of a firearm by a felon. (ECF No. 1.) He has filed four pretrial motions: a "*Daubert* Motion" (ECF No. 10); a "Motion to Suppress Fruits of Invalid Search Warrant" (ECF No. 11); a "Motion to Suppress Statements and Derivative Evidence" (ECF No. 12); and a "Motion to Suppress Fruits of Cell Phone Search" (ECF No. 16). This recommendation and order addresses each of the motions.

**2. "Motion to Suppress Fruits of Invalid Search Warrant" (ECF No. 11)**

On January 7, 2020, Milwaukee Police Officer Ryan DeWitt sought a search warrant for 2236 N. 16th Street in Milwaukee, which the warrant described as "occupied by 'John and Jane Doe'." (ECF No. 11-1 at 1.) Based on an affidavit signed by DeWitt, Milwaukee County Court Commissioner Barry Phillips approved a "no knock" search warrant, identifying the "objects of search" as:

1. Cocaine-a white powdery or an off-white chunky substance;
2. Firearms, ammunition, body armor, gun cases, manuals, cleaning kits
3. Scales, paper packets, plastic bags, aluminum foil and other items used to package cocaine/marijuana/heroin for sale; drug related paraphernalia, records, monies, firearms owned or associated with the premises;
4. Documents, utility pills, keys, and other items used to show who is in control of premises;
5. Cellular phones; computer, camera and or laptop computers, and or any electronic device that would contain data;
6. Vehicles present on premise [sic] and associated with subjects present on premise [sic]

(ECF No. 11-1 at 1.) The warrant closed by commanding the search of "the said premises and/or the said person(s) for things, and take possession thereof, if found." (ECF No. 11-1 at 1.)

DeWitt's affidavit relied on information from a confidential informant. The informant had previously provided information that led to 13 felony drug arrests and four search warrants. (ECF No. 11-1 at 3, ¶ 6.) The informant was involved in more than ten controlled buys and had provided detailed information on residential and mobile drug dealing. (ECF No. 11-1 at 3, ¶ 3.) The informant has two misdemeanor convictions

for disorderly conduct and two felony drug convictions. (ECF No. 11-1 at 3, ¶ 3.) The informant's motivation for cooperating was "monetary payments." (ECF No. 11-1 at 3, ¶ 3.)

The affidavit noted four separate sources of information suggesting that drug dealing was occurring at the target property: an anonymous citizen complaint within the last six months (ECF No. 11-1 at 4, ¶ 12); a citizen complaint within the last four weeks (ECF No. 11-1 at 4, ¶ 13); the affiant's own surveillance within the past seven days (ECF No. 11-1 at 4, ¶ 14); and, most significantly, the informant's information, including the informant's observation of at least three sales of crack cocaine in the past three weeks (ECF No. 11-1 at 4, ¶ 15), a controlled buy for crack cocaine within the past seven days (ECF No. 11-1 at 5, ¶¶ 19-20), and two attempted controlled buys within the past seven days where each time a woman in the residence told the informant that they were "out" and to come back in 30 or 60 minutes (ECF No. 11-1 at 5-6, ¶¶ 22-24). During the last of these attempted controlled buys the informant observed another person purchasing marijuana. (ECF No. 11-1 at 6, ¶ 24.) The informant also reported observing "a male· subject at the door distributing narcotics while armed with a black handgun with an extended magazine." (ECF No. 11-1 at 4, ¶ 16.)

When officers executed the warrant on the morning of January 8, 2020, Stewart was at the residence. Officers detained and searched him, discovering four grams of marijuana in his pants pocket. (ECF No. 11 at 2.)  Officers also found sandwich bags in

his car, which was parked out front of the residence, and a .380 pistol in a heating register in the house. (ECF No. 11 at 2.) In a post-arrest statement, Stewart acknowledged possessing the gun. (ECF No. 11 at 2.)

Stewart contends that the search of his person was unreasonable because he was not named in the warrant. (ECF No. 11 at 2.) He separately argues that the affidavit failed to establish probable cause to search, in general, the residence (ECF No. 11 at 5-7) and, in particular, electronic devices, vehicles, and persons (ECF No. 11 at 7-8).

### 2.1. Search of the Residence

In reviewing whether a warrant is supported by probable cause, this court gives great deference to the conclusion of the issuing judicial officer. *United States v. Thompson*, 801 F.3d 845, 847 (7th Cir. 2015). "Probable cause exists when, based on the totality of the circumstances, there is a fair probability that a search will uncover contraband or evidence of a crime." *Id.* at 847-48 (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). An issuing judicial officer "may draw reasonable inferences about where evidence is likely to be found based on the nature of the evidence and the offense." *United States v. Zamudio*, 909 F.3d 172, 175 (7th Cir. 2018). Thus, "for a search warrant, probable cause 'does not require direct evidence linking a crime to a particular place.'" *Id.* (quoting *United States v. Anderson*, 450 F.3d 294, 303 (7th Cir. 2006)).

When an affidavit relies on information from a confidential informant, the reviewing judicial officer considers that information under the totality of the

circumstances. *United States v. Glover*, 755 F.3d 811, 816 (7th Cir. 2014) (discussing *Gates*, 462 U.S. at 238). "Reliability, veracity, and basis of knowledge are all 'highly relevant,' but the totality-of-the-circumstances approach means 'a deficiency in one may be compensated for … by some other indicia of reliability.'" *Id.* (quoting *Gates*, 462 U.S. at 233). Five factors require specific attention: "the level of detail, the extent of firsthand observation, the degree of corroboration, the time between the events reported and the warrant application, and whether the informant appeared or testified before the magistrate." *Id.*

Provided there is a "'substantial basis' for concluding 'that a search would uncover evidence of wrongdoing,'" this court cannot upset the probable cause finding of the judicial official who issued the search warrant. *United States v. Yarber*, 915 F.3d 1103, 1105 (7th Cir. 2019) (quoting *Gates*, 462 U.S. at 236).

Stewart challenges the warrant paragraph-by-paragraph, arguing that each statement is insufficient to establish probable cause. (ECF No. 11 at 5-7.) But that approach is inconsistent with the totality-of-the-circumstances approach the court must apply. *See Yarber*, 915 F.3d at 1105. Considering the facts contained in DeWitt's affidavit under the totality of the circumstances, the court concludes that there was ample probable cause to search the target residence.

For starters, the confidential informant had a proven track-record of reliability. (ECF No. 11-1 at 3, ¶6.) The informant's reports were reasonably detailed. And the

citizen reports and DeWitt's own observations tended to corroborate the informant's reports. But the strongest evidence that drug dealing was occurring in the property was the informant's controlled buy. (ECF No. 11-1 at 5, ¶ 19.) Although an isolated controlled buy of an unknown quantity of crack cocaine occurring as many as seven days earlier may raise questions of staleness in certain circumstances, other facts sufficiently mitigated any such concern. The anonymous citizen complaint of drug dealing, even though up to six months old (ECF No. 11-1 at 4, ¶ 12), and the known citizen complaint that may have been up to four weeks old (ECF No. 11-1 at 4, ¶ 13), both supported the inference that the drug dealing at the target property was ongoing and persistent rather than an isolated occurrence.

Moreover, DeWitt's own surveillance of many people coming and going from the property in a manner consistent with drug dealing (ECF No. 11-1 at 4, ¶ 14) supported the inference that the property was being used for regular drug sales rather than an isolated sale to the informant. And the informant's observation of another person purchasing marijuana from someone in the target residence (ECF No. 11-1 at 6, ¶ 24) further suggested that there was persistent drug dealing occurring at the property.

"It is well established that the '[p]assage of time is less critical when the affidavit refers to facts that indicate ongoing continuous criminal activity.'" *United States v. Mitten*, 592 F.3d 767, 775 (7th Cir. 2010) (quoting *United States v. Pless*, 982 F.2d 1118, 1126 (7th Cir. 1992)); *see also United States v. Sutton*, 742 F.3d 770, 774 (7th Cir.

2014) (noting that evidence "establish[ing] regularity of drug use or sale" is helpful in determining how long information will remain useful); *United States v. Lamon*, 930 F.2d 1183, 1188 (7th Cir. 1991) ("Indeed, at least one circuit has recognized that probable cause may be found 'several weeks, if not months,' after 'the last reported instance of suspect [drug-trafficking] activity.'") (quoting *United States v. Angulo-Lopez*, 791 F.2d 1394, 1399 (9th Cir. 1986)).

The fact that within the past seven days there were two attempted controlled buys where a person within the target residence said they were "out" does not negate the existence of probable cause. (ECF No. 11-1 at 5-6, ¶¶ 23-24.) Notably, in each instance the informant was told to come back in a very short time—30 or 60 minutes—indicating that the occupant expected additional controlled substances to arrive shortly. "Out" did not mean they were "out" of the drug dealing business. The statement to come back shortly, combined with a history suggesting that drug dealing was longstanding and ongoing, supported the inference that the occupants would soon obtain more controlled substances to sell.

The court further rejects Stewart's argument that this made the search warrant an anticipatory search warrant that was valid only if the persons at the property reacquired controlled substances. (ECF No. 11 at 7.) Notwithstanding the fact that in the last seven days a woman at the property reported being "out" of crack cocaine, the fact that she indicated that she expected to quickly obtain additional crack cocaine meant that there

was still a fair probability that a search would uncover controlled substances. But, more importantly, the search was not limited to looking for controlled substances. (ECF No. 11-1 at 1.) For example, packaging material and evidence of who was in control of the premises would have been evidence relevant to the controlled buy identified in the affidavit. Thus, even if it were reasonable to conclude that controlled substances were not likely to be found in the property, law enforcement still would be authorized to search the property for other evidence of drug dealing, which was likely to remain within the property even seven days after the controlled buy.

### 2.2. Search of Electronic Devices and Vehicles

Stewart also argues that there was no probable cause to search any electronic device or vehicle because DeWitt's affidavit did not connect those to any crime. (ECF No. 11 at 7.) The government offers only the barest of responses when it argues, "the search of vehicles and seizure of electronic devices were supported by the affiant's statement that his training and experience led him to believe that controlled substances can be secreted in 'vehicles on and associated with the premises,' and that it is common for those who possess controlled substances to use cellular devices to conduct trafficking business and take photographs of contraband in their possession." (ECF No. 17 at 11.)

### 2.2.1. Vehicles

Affidavits submitted in support of search warrants seeking to search vehicles in relation to a drug investigation routinely include a statement that, "based upon his training and experience he knows that illicit drug dealers often use their automobiles to deliver drugs to their customers and often store drugs and paraphernalia related to the sale of these drugs in these automobiles." *United States v. Lamon*, 930 F.2d 1183, 1185 (7th Cir. 1991). But that is not what DeWitt asserted here. He asserted merely that, based on his training and experience, "controlled substances can be secreted in … vehicles on and associated with the premises." (ECF No. 11-1 at 6, ¶ 25.) It hardly takes any sort of training or experience to make such an observation.

Officers are not authorized to search a location simply because it is capable of holding controlled substances; controlled substances can be secreted pretty much anywhere. Rather, an affiant is required to show that there is a fair probability that a search of the "[v]ehicles present on premise and associated with subjects present on premise" will uncover contraband or evidence of a crime. The affidavit here wholly fails to connect any specific vehicle (or even vehicles generally) to the offense of drug dealing. Because the government has failed to muster any further support for the search any vehicle, the court concludes that DeWitt's affidavit failed to establish probable cause to search Stewart's vehicle.

### 2.2.2. *Leon* Good Faith Exception

Having concluded that DeWitt's affidavit failed to establish probable cause to search Stewart's vehicle, the court must consider whether exclusion of the evidence against Stewart is appropriate. Under the good faith exception to the probable cause requirement, a police officer is generally entitled to rely on the conclusion of an issuing judicial officer and presume a search warrant is valid. *See United States v. Leon*, 468 U.S. 897, 922 (1984). DeWitt's "decision to obtain a warrant is prima facie evidence that he was acting in good faith." *United States v. Thompson*, 801 F.3d 845, 848 (7th Cir. 2015). It is frequently said that a defendant may rebut prima facie evidence of good faith "by showing that (1) the judge issuing the warrant abandoned his detached and neutral role; (2) the officer was dishonest or reckless in preparing the affidavit; or (3) the warrant was so lacking in probable cause that the officer's belief in its existence was entirely unreasonable." *See, e.g.*, *United States v. Garcia*, 528 F.3d 481, 487 (7th Cir. 2008).

Stewart argues

> *Leon* is inapplicable because: (1) the magistrate "wholly abandoned his judicial role," or otherwise failed in his duty to "perform his 'neutral and detached' function and not serve merely as a rubber stamp for the police"; and (2) the officer submitted an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *See United States v. Koerth*, 312 F.3d 862, 868 (7th Cir. 2002); *Leon*, 468 U.S. at 914, 923.

(ECF No. 18 at 6.) However, with regard to the search of the vehicle, he fails to support these bald assertions other than to say: "There were also no alleged facts in the affidavit

establishing that evidence of cocaine distribution would be found in all vehicles…. The affiant's training and experience, alone, are insufficient to show probable cause." (ECF No. 18 at 7.)

But that is merely a repetition of his argument that the warrant failed to establish probable cause to search the vehicle. To demonstrate that the judicial officer abandoned his neutral role requires far more than showing that the search was unsupported by probable cause. To say that the "warrant was so lacking in probable cause that the officer's belief in its existence was entirely unreasonable," however, is ultimately an assessment of how far short of the probable cause bar the affidavit fell.

> Police officers are not expected to be trained as lawyers and are not required review search warrants with the scrutiny demanded from a judicial officer. "Judicial officers have the responsibility to determine whether there is probable cause to issue a warrant; police officers should not be expected to question that determination." *Harju*, 466 F.3d at 606; *see also*, *Illinois v. Krull*, 480 U.S. 340 (1987) ("It is the judicial officer's responsibility to determine whether probable cause exists to issue a warrant, and, in the ordinary case, police officers cannot be expected to question that determination."); *Massachusetts v. Sheppard*, 468 U.S. 981, 989-90 (1984) ("[W]e refuse to rule that an officer is required to disbelieve a judge who has just advised him, by word and by action, that the warrant he possesses authorizes him to conduct the search he has requested."). However, "[p]olice officers in effecting searches are charged with a knowledge of well-established legal principles as well as an ability to apply the facts of a particular situation to these principles," *United States v. Koerth*, 312 F.3d 862, 869 (7th Cir. 2002) (quoting *United States v. Brown*, 832 F.2d 991, 995 (7th Cir. 1989)), and therefore cannot blindly rely upon a search warrant simply because it bears the signature of a judge.

*United States v. Avila-Rodriguez*, No. 10-CR-163, 2011 U.S. Dist. LEXIS 38246, at *37-38 (E.D. Wis. Feb. 16, 2011).

DeWitt's affidavit was not so deficient that a reasonable police officer should have recognized the lack of probable cause to search the vehicles. First, there is nothing unusual about a search of associated vehicles being included in a search of a residence believed to be used to sell drugs. Courts routinely authorize such searches. Second, on some level, similar to the oft-repeated observation that evidence of drug dealing is likely to be found in a drug dealer's home, *see United States v. Bradford*, No. 19-CR-162, 2019 U.S. Dist. LEXIS 230484, at *8 (E.D. Wis. Nov. 15, 2019) (citing cases), there is some reason to suspect that evidence of drug dealing is likely to be found in a drug dealer's car. And, third, the affidavit was not wholly devoid of an attempt to establish probable cause to search the vehicles. As recounted above, DeWitt noted that "controlled substances can be secreted in … vehicles on and associated with the premises." (ECF No. 11-1 at 6, ¶ 25.) As explained, this was not enough to establish probable cause to search the vehicles. But a law enforcement officer, who is generally entitled to rely on a judicial officer's conclusion, should not have been expected to question the judicial officer's conclusion.

The court finds that, although DeWitt's affidavit did not establish probable cause to search Stewart's vehicle, the good faith exception applies. Consequently, suppression of any evidence seized from that vehicle is inappropriate.

### 2.2.3. Electronic Devices

The support in DeWitt's affidavit for seizing and searching electronic devices is far more substantial. Specifically, DeWitt averred:

> drug dealers often possess portable electronic telecommunications equipment to remain in constant communication with their customers and suppliers; that drug dealers frequently possess money or other proceeds which are derived from drug trafficking as well as any other writings or electronically recorded data and the equipment to analyze this data as well as any other documentary evidence evincing drug trafficking ….

> That affiant has found it incredibly common for crime suspects who possess narcotics to often take or cause to be taken photographs and other visual depictions of themselves, their associates, and the narcotics that they control, possess, buy and sell; furthermore, that these photographs and visual depictions are typically kept and maintained on their cellular devices; that affiant has also found it common for crime suspects to use cellular telephones to communicate aurally or via electronic message in "text" format with individuals whom they purchase, trade, or otherwise negotiate to obtain narcotics; lastly, that affiant is also aware that individuals that are involved in criminal behavior also frequently store other information inside of their cellular phones, including contact lists, records of past phone calls, and other items related to their criminal activities.

(ECF No. 11-1 at 6, ¶¶ 26-27.)

Cellular phones are ubiquitous in life, and when a person's life involves drug dealing, evidence of that criminal activity is likely to be found on a person's cellular phone. Moreover, "circuits throughout the Country have recognized that cellphones are tools of the drug trafficking trade." *United States v. Saunders*, No. 5:16-CR-21, 2017 U.S. Dist. LEXIS 50382, at *10-11 (N.D. W.Va. Mar. 3, 2017) (citing *United States v. Hammett*, 555 Fed. Appx. 108, 2014 WL 642501, at *1-2 (2d Cir. 2014) (holding that cell phones are

"tools that drug dealers often possess"); *United States v. Portalla*, 496 F.3d 23, 27 (1st Cir. 2007) (recognizing that "cell phones …[are] essential tools of the[] drug trade"); *United States v. Sasson*, 62 F.3d 874, 886 (7th Cir. 1995) (describing possession of cell phones as "the usual 'trappings' of a person involved in the drug trade"); *United States v. Slater*, 971 F.2d 626, 637 (10th Cir. 1992) (stating that a cell phone is a "recognized tool of the trade in drug dealing"); *see also, e.g., United States v. Gorny*, No. 13-70, 2014 U.S. Dist. LEXIS 84807, at *18-19 (W.D. Pa. June 23, 2014) (citing *United States v. Jones*, Cr. No. 07-258, 2009 U.S. Dist. LEXIS 54575, 2009 WL 1855832, at *4 (E.D. Pa. Jun. 26, 2009) ("Cell phones are considered essential tools of the drug trade."); *United States v. Hardwick*, No. 1:18-CR-398-AT-JFK, 2019 U.S. Dist. LEXIS 225525, at *25 (N.D. Ga. June 7, 2019) (citing *United States v. Lisbon*, 835 F. Supp. 2d 1329 (N.D. Ga. 2011); *United States v. Meador*, 2008 U.S. Dist. LEXIS 92728, 2008 WL 4922001, at **14-15 (E.D. Mo. January 7, 2008)); *cf. Riley v. California*, 573 U.S. 373, 401 (2014) ("Cell phones have become important tools in facilitating coordination and communication among members of criminal enterprises, and can provide valuable incriminating information about dangerous criminals.").

Moreover, "[w]arrants may be issued even in the absence of direct evidence linking criminal objects to a particular site." *United States v. Kelly*, 772 F.3d 1072, 1080 (7th Cir. 2014) (quoting *United States v. Orozco*, 576 F.3d 745, 749 (7th Cir. 2009)). Additionally, judicial officers, like law enforcement officers, are entitled to draw on

their training and experience in making probable cause determinations. *United States v. Elst*, 579 F.3d 740, 746 (7th Cir. 2009).[1] In this court's experience (and it presumes that of every judicial officer who routinely reviews drug-related search warrants), there is a strong connection between mobile phones and evidence of drug dealing. The fact that the affidavit did not include any suggestion that anyone within the target residence ever used a cell phone for drug dealing (or even possessed such a device) does not negate the natural inference that people commonly possess mobile phones, mobile phones are a tool of drug dealers, and when a person is engaged in drug dealing evidence of that offense is likely to be found on a mobile phone.

Finally, as discussed below, law enforcement obtained a separate warrant for Stewart's phones, thus negating any concerns as to whether the initial warrant was sufficient to authorize a comprehensive search of Stewart's phones. The court finds the initial warrant was sufficient to authorize the seizure and any preliminary search of the phones.

## 2.3. Search of Stewart

The search warrant did not describe any "said person" as an object of the search. Thus, the boilerplate command at the bottom of the warrant to search "the said premises and/or the said person(s) for things, and take possession thereof, if found"

---

[1] Stewart notes (ECF No. 16 at 2) that the Wisconsin Supreme Court has held, "The subjective experiences of the magistrate are not part of the probable cause determination, *State v. Ward*, 2000 WI 3, 231 Wis. 2d 723, 736, 604 N.W.2d 517, 523. To the extent that this statement may be inconsistent with controlling Seventh Circuit law it is of no help to Stewart. This court's decision is governed by federal law.

(ECF No. 11-1 at 1) was insufficient to authorize the search of any person. And the government makes no attempt to argue that the search of Stewart was authorized under the warrant. Rather, the government argues that the search of Stewart was authorized as a search incident to arrest. It offers the following facts in its brief:

> In this case, on January 8, 2020, upon the execution of the search warrant, Stewart was detained on a mattress in one of the bedrooms. Upon entry into the house, in plain view in the living room of the residence was a digital scale and a metal baking sheet with a razor and suspected crack cocaine residue on the table. Furthermore, found on the bed in another bedroom next to Stewart's identification card, debit card, were several methamphetamine pills and powder.

(ECF No. 17 at 14.) However, the government fails to offer any evidentiary support for these assertions. Not so much as a police report is attached to the government's response.

But in reply Stewart does not dispute these details. He instead offers his own, similarly unsupported additional details. He asserts, "The area where Stewart was detained—the rear bedroom—did not contain any incriminating items in plain view." (ECF No. 18 at 1.) He further argues that this was not his residence and he had just stopped by, leaving his car running out front, when the warrant was executed.[2] (ECF No. 18 at 2.) He contends that, given his brief time in the house, "[t]here would have been no time for Stewart to touch any of the alleged items in plain view, assuming that he observed them, which he did not." (ECF No. 18 at 2.)

---

[2] In the recorded interrogation Stewart appears to state that he was staying at the residence and had gone outside to start his car when the warrant was executed.

Stewart also, for the first time in his reply brief, requests an evidentiary hearing to determine "what information Officer DeWitt—the officer who searched Stewart—knew prior to his search of Stewart's person" and "what information the arresting officer knew." (ECF No. 18 at 2.) Even though this request for an evidentiary hearing did not comply with Crim. L.R. 12(c), the government nonetheless responded, indicating its opposition to any such hearing. (ECF No. 19.) This led to Stewart filing a "Response to Government's Letter Opposing Evidentiary Hearing," a document that was improperly filed as a new motion and which is not authorized under the Local Rules. *See* Crim. L.R. 12(c). For the reasons explained below, the court concludes that, notwithstanding Stewart's failure to comply with the court's local rules, an evidentiary hearing is not required.

> Whether that arrest was constitutionally valid depends in turn upon whether, at the moment the arrest was made, the officers had probable cause to make it -- whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense.

*Beck v. Ohio*, 379 U.S. 89, 91 (1964). However, "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979).

The defendant in *Ybarra* was merely a customer in a tavern in which the bartender was suspected of having heroin for sale. Here, the officers possessed more than Stewart's "mere propinquity to others independently suspected of criminal

activity." Stewart was in a private home where contraband was in plain view, and he and his personal property were in close proximity to that contraband. "[T]hose who are permitted to observe obvious criminal activity in a home are, absent indications to the contrary, likely to be complicit in the offense." *United States v. Heath*, 455 F.3d 52, 57 (2d Cir. 2006). Should his arrest for possession of that contraband have led to prosecution, Stewart's contention that it was not his home and that he did not see any contraband may lead a jury to acquit him. But these details did not negate the existence of probable cause for his arrest.

However, before the court can conclude that Stewart's arrest was lawful, it must know whether the officers observed the contraband before or after Stewart was arrested. The government has failed in its burden to demonstrate that, at the time Stewart was arrested and searched, officers had already observed the contraband. Ordinarily an evidentiary hearing would be necessary to answer that question. But the government argues that an evidentiary hearing remains unnecessary because,

> [u]pon locating the contraband in the house, to include the gun found in the heat register, cartridge of ammunition, and marijuana between the mattresses, in the bedroom containing Stewart's jacket and identification cards, officers could have and would have applied for a warrant to search his person had that been necessary. Therefore, the evidence on Stewart's person would have inevitably been discovered.

(ECF No. 17 at 15.)

"The doctrine of inevitable discovery provides that illegally obtained evidence will not be excluded if the Government can prove, by a preponderance of the evidence,

that the officers 'ultimately or inevitably would have … discovered [the challenged evidence] by lawful means." *United States v. Marrocco*, 578 F.3d 627, 637 (7th Cir. 2009) (quoting *Nix v. Williams*, 467 U.S. 431, 444 (1984)). This requires the government to prove two elements: (1) "it had, or would have obtained, an independent, legal justification for conducting a search that would have led to the discovery of the evidence"; and (2) "it would have conducted a lawful search absent the challenged conduct." *Id.* at 638. The doctrine is not to be invoked lightly. *United States v. Brown*, 328 F.3d 352, 357 (7th Cir. 2003). Rather, it should be applied "only where is it clear that 'the deterrence rationale of the exclusionary rule has so little basis that the evidence should be received.'" *Id.* (quoting *United States v. Cotnam*, 88 F.3d 487, 496 (7th Cir. 1996)). "The exclusionary rule is a sanction that is supposed to be proportioned to the wrongdoing that it punishes; the rule should not be used to make the person whose rights have been violated better off than he would be if no violation had occurred." *Id.*; *see also Hudson v. Michigan*, 547 U.S. 586, 591 (2006) ("Suppression of evidence, however, has always been our last resort, not our first impulse.").

Although opposing an evidentiary hearing, the government has not offered any evidence as to what the officers would have done had a search of Stewart's person been necessary. *Cf. United States v. Bradford*, No. 19-CR-162, 2020 U.S. Dist. LEXIS 25866, at *19 (E.D. Wis. Feb. 14, 2020) ("[T]he government bears the burden of proof under the inevitable discovery / independent sources doctrines, and it must carry that burden

with evidence not merely argument or supposition.") (citing *United States v. Groce*, 255 F.

Supp. 2d 936, 945 (E.D. Wis. 2003)); *United States v. Robinson*, No. 1:08-CR-74-TS, 2009

U.S. Dist. LEXIS 60467, at *55 (N.D. Ind. July 13, 2009) ("The Seventh Circuit has

admonished that the Government typically must meet this standard of proof with

evidence (and not merely memoranda).") (citing *United States v. Jones*, 72 F.3d 1324, 1334

(7th Cir. 1995)).

The court nonetheless finds that an evidentiary hearing is unnecessary and

suppression inappropriate. It is obvious that the contraband on Stewart's person would

have been inevitably discovered. Even if officers had not yet observed the contraband in

plain view and its relationship to Stewart when they arrested him, in executing the

search warrant they inevitably would have observed the contraband, connected it to

Stewart, and arrested and searched Stewart. After all, locating evidence and contraband

and determining who was responsible for it was the reason officers went to the house

that morning armed with a search warrant.

In *United States v. Jones*, 72 F.3d 1324, 1330 (7th Cir. 1995), the court presumed that

Secret Service agents executing a search warrant arrested and searched the defendant

before having probable cause to arrest him. However, suppression of the evidence

obtained from the defendant was not required because agents would have obtained

probable cause during the execution of the search warrant, leading inevitably to the

defendant's arrest and search. *Id.* at 1332.

Granted, the quality and quantum of evidence against the defendant in *Jones* was more significant than that against Stewart, but, as discussed above, there was nonetheless sufficient evidence to arrest Stewart. Consequently, the same conclusion is appropriate—probable cause to arrest Stewart would have been discovered during the execution of the search warrant, leading to Stewart's arrest and search incident to arrest, and therefore the inevitable discovery of the evidence on his person. *See Jones*, 72 F.3d at 1330-32; *see also United States v. Cotnam*, 88 F.3d 487, 496 (7th Cir. 1996); *United States v. Green*, No. NA 02-27-CR H/N, 2003 U.S. Dist. LEXIS 14552, at *14 (S.D. Ind. Aug. 12, 2003).

In sum, Stewart's argument in support of both suppression and his request for an evidentiary hearing is at best that, maybe, the arresting officer had not yet seen the contraband and connected it to Stewart at the time of the arrest. But it is undisputed that, in the course of executing the search warrant, officers did discover this evidence. The sole dispute is one of timing, a dispute that proves inconsequential under the inevitable discovery doctrine. No evidentiary hearing is needed to sort out whether Stewart's speculation of timing is correct. It is clear that Stewart would have been arrested and searched all the same. Thus, no basis exists for suppressing any evidence recovered during a search of Stewart.

### 3. "Motion to Suppress Fruits of Cell Phone Search" (ECF No. 16)

Stewart seeks to suppress evidence obtained pursuant to a separate search warrant that this court issued to search two mobile phones seized from the residence. (ECF No. 16 at 6.) He argues that the affidavit submitted in support of this search warrant "failed to establish a nexus between the cell phones and the alleged violations of 18 U.S.C. § 922(g), § 924(a), § 924(c), and 21 U.S.C. § 841(a)(1)." (ECF No. 16 at 1-2.) He notes that the affidavit does not say state that Stewart used the phones in his marijuana sales or otherwise used the phones to commit any crime. (ECF No. 16 at 2.) Rather, the affidavit says simply that the phones were found in the bedroom where Stewart was detained. (ECF No. 16 at 2.)

As discussed above, in the experience of this court and the view of many other courts across the country, there is a strong connection between mobile phones and drug dealing. For many of the same reasons for which it is often said that evidence of drug dealing is likely to be found in a drug dealer's home, *see Bradford*, No. 19-CR-162, 2019 U.S. Dist. LEXIS 230484, at *8-9 (citing cases), it can be said that evidence of drug dealing is likely to be found on a drug dealer's mobile phone. Mobile phones commonly contain comprehensive records of a person's life. If that life includes drug dealing, evidence of it is likely to be on the person's phone. Relevant data is not necessarily limited to the sort of information a user might readily access—*e.g.* photographs,

contacts, text messages—but also the sorts of data that can be recovered forensically—*e.g.* location data, deleted files, internet history.

The affidavit supporting the search warrant contained probable cause to believe that the target phones were used by a drug dealer. Controlled substances and evidence of drug dealing were found throughout the residence, including on the mattress where the phones were found. More specifically, there was probable cause that the phones were Stewart's. They were found on the mattress on which Stewart was detained. (ECF No. 16-1 at 11, ¶ 17.) And the affidavit contained probable cause that Stewart was a drug dealer—most significantly his own admission. (ECF No. 16-1 at 12, ¶ 19.)

Finally, Stewart challenges the search of the phones on the ground that the investigators waited too long before obtaining the search warrant—76 days. (ECF No. 16 at 5.) The only authority Stewart cites is *United States v. Burgard*, 675 F.3d 1029, 1032 (7th Cir. 2012). *Burgard* (in which the court ultimately approved a six-day delay) involved a delay in obtaining a search warrant for a phone after an initial *warrantless* seizure. Significant to the court's discussion was the apparent contradiction between a warrantless seizure based on exigent circumstances and a subsequent delay in obtaining a search warrant. Here, as discussed above, officers lawfully seized the mobile phones pursuant to the initial search warrant and retained them as evidence. Thus, the infringement on the owner's possessory interest in the seized property, which was

central to the court's concern in *Burgard*, 675 F.3d at 1033, was not implicated by the delay here.

Consequently, the court finds no basis for suppressing evidence obtained from the phones.

**4. "Motion to Suppress Statements and Derivative Evidence" (ECF No. 12)**

Stewart also seeks to suppress the statements he made during his post-arrest interrogation because "[h]is mental state was severely compromised." (ECF No. 12 at 1.) He told the officers that he had been up for three days on an ecstasy binge. (ECF No. 12 at 1.) Officer DeWitt indicated that they wished to question Stewart regarding a shooting that had happened the day before. (ECF No. 12 at 2.) But later the interrogators began to question Stewart about his marijuana sales and possession of a firearm. (ECF No. 12 at 2.) When Stewart asked if he would go to jail if he said he kept a gun on him when he kept marijuana on him, an agent said, "No." (ECF No. 12 at 2.)

When a person is subject to custodial interrogation he must be advised of his rights under *Miranda* and agree to voluntarily waive those rights before any statement may be used against him in court. *United States v. Thurman*, 889 F.3d 356, 364 (7th Cir. 2018); *United States v. LeShore*, 543 F.3d 935, 941 (7th Cir. 2008) (citing *Miranda v. Arizona,* 384 U.S. 436, 476 (1966)). It is the government's burden to show by a preponderance of the evidence that the defendant voluntarily waived those rights. *Thurman*, 889 F.3d at 364 (citing *Berghuis v. Thompkins*, 560 U.S. 370, 382-84 (2010)).

Even if preceded by the *Miranda* warnings a statement may nonetheless be involuntary. *LeShore*, 543 F.3d at 940. "[A] defendant's personal characteristics alone are insufficient to render a confession involuntary;" some type of official coercion is required. *United States v. Lawal*, 231 F.3d 1045, 1048 (7th Cir. 2000) (quoting *Watson v. DeTella*, 122 F.3d 450, 453 (7th Cir. 1997)); *see also Colorado v. Connelly*, 479 U.S. 157, 167 (1986) ("coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."). However, a person's personal characteristics, including intoxication, are relevant when assessing whether, under the totality of the circumstances, the defendant's personal characteristics made the interrogator's mental or physical coercion more effective and thus rendered the statement involuntary. *United States v. Montgomery*, 14 F.3d 1189, 1195 (7th Cir. 1994). Relevant factors also include the nature and duration of the questioning, whether the defendant was prevented from sleeping or eating, whether he was under the influence of drugs or alcohol, and his age, intelligence, education, and experiences with the criminal justice system. *Watson*, 122 F.3d at 453.

At the outset of the interrogation, DeWitt read Stewart his *Miranda* rights, and Stewart agreed to speak to the investigators. The interrogation was relatively short, with the recording spanning from about 11:20 AM to 12:26 PM. It was exceptionally low-key and friendly. Never were there any raised voices or any conduct that was remotely physically or verbally threatening. Throughout, Stewart was alert and oriented. In no

way did he exhibit characteristics of a person who had not slept in three days, as he claims. Stewart was unhandcuffed and moved freely, standing when he wished—which he did frequently. The three investigators in the room appear to be unarmed, each having an empty holster on a leg or hip.

The court disagrees with Stewart's characterization of his mental state as "scatterbrained." He is attentive to the investigators' questions, and his answers are logical and coherent. He is consciously evasive when presented with a question he does not want to answer. At times he is difficult to understand, but that appears to be intentional, and it is aggravated by imperfect audio and the fact that he often speaks over the agents. His speech is generally rapid and his manner energetic but not so extreme as to suggest intoxication.

At the end of the interview, investigators ask Stewart if he is currently high. When he says that he is (on marijuana; contrary to the assertions in his brief, he denied using ecstasy,), they explicitly asked him how he can function when he's high. Stewart said he gets high every day and nevertheless is able to understand what is going on around him, remember what happens, and understand what people are saying, including what the investigators have been saying. (Video, 12:23:56-12:26:00.)

The fact that investigators noted they were investigating a shooting that occurred the day before does not render Stewart's statement involuntary. Setting aside that interrogators are permitted to lie (within certain limits), *United States v. Villalpando*, 588

F.3d 1124, 1128 (7th Cir. 2009), the statement was truthful. They *were* investigating a shooting and, but for that shooting, they would not have served the search warrant that morning. As DeWitt explained, they were also investigating drug sales from the property and were going to continue with that investigation, but the shooting is what spurred them to act immediately. DeWitt and Stewart discussed the shooting at length.

The only aspect of the interrogation that gives the court pause is what occurred when Stewart was first questioned about possessing a firearm while selling marijuana. An agent (not DeWitt) asked Stewart, "So when you're selling weed or anything you keep a gun on you or anything?" (Video, 12:01:15.) Stewart stutters and mumbles in response and then asks, "So like, if I say, if I use, am I gonna go to jail for it, y'all gonna charge me?" "No," the agent interjects. DeWitt adds, "We just have to figure out. Like, and it goes to your credibility. I need you to be honest about you carrying a gun." Stewart then moves on to talking about having been robbed. It is unclear if he carried a gun for some period after he was robbed or if, when he was robbed, his gun was stolen from him. In any event, that discussion related to a .22 caliber revolver, a different gun than the one referenced in the indictment. He explains that since the robbery he had not been able to afford a new gun.

The conversation eventually turns toward the gun that investigators found in the house. In response to Stewart saying that he never touched the gun, DeWitt refers to Stewart's admissions regarding the .22 revolver and says, "If we wanted, that's enough

to send you away." (Video, 12:07:22). Stewart responds, "I know." DeWitt then explains that they conduct federal investigations and want to learn of everyone who has had possession of the firearm found in the house. He says that they were going to get Stewart's DNA and be able to determine if he touched the gun. The agent interjects that it will be worse for Stewart if he does not cooperate now; it would be better if they could say that he "confessed to it" and said he "messed up." DeWitt added that he was not saying it was his gun but that he thought Stewart put the gun where it was found.

The agent saying "No" in response to Stewart asking if he would be charged if he admits having a gun while selling marijuana appears to have been a false promise of leniency. "[A] government agent's 'false promise of leniency may render a statement involuntary'" because it "could prevent a suspect from making a rational choice by distorting the alternatives among which the person under interrogation is being asked to choose." *United States v. Nichols*, 847 F.3d 851, 857 (7th Cir. 2017) (quoting *Villalpando*, 588 F.3d at 1128). However, the agent saying "No" appears to have had no effect on Stewart. He did not respond with any acknowledgment of the agent's statement or, now believing he is shrouded with immunity, proceed to admit to carrying a gun. Rather, he discusses being robbed and continues denying that he carried a gun while selling marijuana.

Significantly, it is amidst these denials that DeWitt notes that Stewart's admissions regarding possessing the .22 revolver are enough to "send [him] away" if

they wanted to (Video, 12:07:22), clearly putting Stewart on notice that he is liable to prosecution for possessing a firearm. Moreover, the agent interjected that denying possessing the gun and forcing investigators to connect him to the gun by DNA would be "worse" than if he "confessed" that he "messed up." (Video, 12:07:45.) These statements all would have communicated to a reasonable person in Stewart's position that, notwithstanding the agent saying "No," the investigators were looking to prosecute him for possessing the gun.

Although it was inappropriate for the agent to say "No" when Stewart asked if he would be prosecuted for possessing a firearm if he admitted to having one when he sold marijuana, this isolated statement appears to have had no impact on Stewart. In short, there is no evidence of a causal connection between the agent saying "No" and Stewart's confession. He was soon thereafter (and before making any admission) apprised that the investigators *were* looking to prosecute him for having a gun. The Court of Appeals for the Seventh Circuit has rejected the argument that an isolated false promise renders a statement involuntary per se. *United States v. Montgomery*, 555 F.3d 623, 630 (7th Cir. 2009).

Under the totality of the circumstances, the court finds that Stewart's statements were voluntary. Stewart was 39 years old and experienced with the criminal justice system, including having served time in prison. He had obtained a G.E.D. By all indications he was intelligent, having adequate recall of events and recognizing the

implications of certain admissions. Although he stated he was high on marijuana, he acknowledged that even when high he was able to understand what was going on and remember what happened. His conduct during the interrogation was consistent with this. Although he claimed to have been up for three days, if true it did not have any apparent effect on him. Stewart was alert, attentive, and responsive throughout, never exhibiting any sign of fatigue. The entire interrogation was low-key, cordial, and conversational. Stewart was not handcuffed, and the investigators were unarmed. The interrogation was short, lasting just over an hour. In no way did the interrogators wear Stewart down. The agent's false statement that Stewart would not be charged did not render Stewart's statement involuntary, both because it had no apparent effect on Stewart and because it was quickly made clear to Stewart that the investigators *were* looking to prosecute him for possessing a gun. Only then did he offer any material admission regarding the gun that is the basis for the charges in the indictment. Even considering that, given his allegedly impaired status, "a lesser quantum of coercion may be sufficient to call into question the voluntariness of the confession," *LeShore*, 543 F.3d at 940-41, Stewart's statements were voluntary under the totality of the circumstances.

Finally, Stewart alleges, "DeWitt made a false promise to Stewart after his arrest at the 2236 North 16th St. residence and while at that residence[,] … that if Stewart provided a statement during the interview relative to the target of the search warrant

Case 2:20-cr-00056-JPS-WED    Filed 05/13/20    Page 30 of 34    Document 27

(K.W.), he would not be charged with the items seized at the residence[,] and that he would be able to be released that day." (ECF No. 12 at 6.)

He requests an evidentiary hearing regarding this claim. However, he did not fully comply with Crim. L.R. 12(c), which is reason enough to deny Stewart's request. Moreover, aside from an assertion in his brief, he does not substantiate this claim. For example, he does not submit any affidavit or declaration to support this claim. *See United States v. Derrick*, No. 14-CR-58, 2014 U.S. Dist. LEXIS 196372, at *3 (E.D. Wis. Apr. 15, 2014); *United States v. Dotson*, No. 12-CR-58, 2012 U.S. Dist. LEXIS 191071, at *8 (E.D. Wis. May 3, 2012). In light of certain statements and characterizations in his brief already having been contradicted by the video of Stewart's interrogation, the court is disinclined to find the statements in Stewart's brief a sufficient basis for ordering an evidentiary hearing.

Even if the court were to set aside these defects, it would find that Stewart failed to show that an evidentiary hearing is necessary. If such a statement had been made by DeWitt, under traditional principles of attenuation, *see, e.g.*, *United States v. Green*, 111 F.3d 515, 521 (7th Cir. 1997), it was sufficiently removed so as to not have affected the subsequent interrogation. It was made at a different location, and prior to Stewart making an incriminating statement, DeWitt advised Stewart of his *Miranda* rights, including that "anything you say can and will be used against you in a court of law." (Video, 11:21:52.) Investigators made clear to Stewart that they *were* looking to prosecute

him for the gun found in the residence. Yet never did Stewart ever refer to any purported promise of immunity.

### 5. *Daubert* **Motion**

Finally, Stewart seeks a hearing pursuant to *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579 (1993) and Fed. R. Evid. 702, to challenge the proposed conclusions of a DNA analyst. (ECF No. 10-1.) The government did not respond to this motion, instead noting, "District Judge J.P. Stadtmueller set a date of May 13, 2020 to file *Daubert* motions. If and when the defendant renews his motion at that time, the government will so respond." (ECF No. 17 at 23.)

As matters relating to trial and involving the exercise of the trial court's discretion, magistrate judges in this district have traditionally not addressed *Daubert* motions in criminal matters. *See United States v. Vallejo*, No. 05-CR-240, 2007 U.S. Dist. LEXIS 15555, at *26 (E.D. Wis. Mar. 5, 2007). Therefore, the court defers this motion to Judge Stadtmueller.

### 6. **Conclusion**

The affidavit in support of the state-issued search warrant readily established probable cause to search the target residence, including for the seizure of the electronic devices. The second federal search warrant established probable cause to search two phones seized from the residence, and the delay in seeking this second warrant is not a basis for suppression. And although the affidavit in support of the first search warrant

did not establish probable cause to search any vehicle, the good faith exception makes suppression of any evidence seized from Stewart's vehicle inappropriate.

The search of Stewart was not authorized under the state search warrant and the government has not shown that there existed probable cause to arrest Stewart at the time he was searched. However, even if officers had not yet garnered probable cause to arrest Stewart when he was searched, they inevitably would have discovered this evidence during the execution of the search warrant, thus leading to Stewart's arrest and his search incident to arrest. Because these relevant facts are undisputed, an evidentiary hearing is unnecessary.

In addition, Stewart's statements were voluntary under the totality of the circumstances. Although there was an isolated inappropriate promise, there is no evidence that it affected Stewart. And, in any event, investigators made clear to Stewart that they were looking to prosecute him for the gun found in the house. Nor has Stewart met his burden to show that an evidentiary hearing is necessary regarding his claim that, at the scene of his arrest, he was told he would not be prosecuted for the evidence found in the home.

Finally, the court defers Stewart's *Daubert* motion to Judge Stadtmueller.

**IT IS THEREFORE RECOMMENDED** that Stewart's "Motion to Suppress Fruits of Invalid Search Warrant" (ECF No. 11) be **denied**.

**IT IS FURTHER RECOMMENDED** that Stewart's "Motion to Suppress Statements and Derivative Evidence" (ECF No. 12) be **denied**.

**IT IS FURTHER RECOMMENDED** that Stewart's "Motion to Suppress Fruits of Cell Phone Search" (ECF No. 16) be **denied**.

**IT IS FURTHER ORDERED** that Stewart's request for an evidentiary hearing regarding his "Motion to Suppress Fruits of Invalid Search Warrant" (*see* ECF No. 18 at 10-11) is **denied**.

**IT IS FURTHER ORDERED** that Stewart's request for an evidentiary hearing regarding his "Motion to Suppress Statements and Derivative Evidence" (ECF No. 12) is **denied**.

**IT IS FURTHER ORDERED** that Stewart's "Motion for a *Franks* Hearing" (ECF No. 24) is **denied** as untimely.

Your attention is directed to 28 U.S.C. § 636(b)(1)(B) and (C) and Fed. R. Crim. P. 59(b)(2), whereby written objections to any recommendation herein or part thereof may be filed within fourteen days of service of this recommendation or prior to the Final Pretrial Conference, whichever is earlier. Failure to file a timely objection with the district court shall result in a waiver of your right to appeal.

Dated at Milwaukee, Wisconsin this 13th day of May, 2020.

WILLIAM E. DUFFIN
U.S. Magistrate Judge