# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

                  Plaintiff,

v.

ANTONIO L. STEWART,

                  Defendant.

Case No. 20-CR-56-JPS

**ORDER**

On April 9, 2020, Defendant Antonio L. Stewart ("Stewart") filed a motion to exclude the government's expert (Docket #10),[1] a motion to suppress the fruits of an invalid search warrant, (Docket #11), a motion to suppress involuntary statements, (Docket #12), and a motion to suppress

---

[1] The government's failure to respond to the *Daubert* motion because it was filed before May 13, 2020 is a bit confusing. The government should refer back to the trial scheduling order, which states that "*Daubert* motions must be filed **on or before** Wednesday, May 13, 2020." (Docket #13 at 4) (emphasis added). Defendant's motion was timely, and the government should have responded to it in the first instance—neither the trial scheduling order nor any rule governing procedure before this Court permits a party to unilaterally "reserve[] the right to respond to the defendant's Daubert motion at a later time," as the government did. (Docket #17 at 23). If the government sought an extension of time to respond—or would currently like an extension of time to respond—it must file a motion to extend time to respond and show good cause and excusable neglect, like all other litigants. *See* Fed. R. Crim P. 45(b)(1). At this juncture, the Court declines to offer such an extension absent such a showing. *Id.*

On a substantive note, it appears to the Court that a *Daubert* hearing is very much warranted. While Stewart's motion is brief, it demonstrates the government's lack of explanation as to how the expert reached her conclusion that there was a match between Stewart's DNA and the DNA found on the firearm in this case. While science can be instructive and helpful in evidentiary matters, it must also be reliable. Courts should evaluate proffered experts with rigorous scrutiny. The matter will be referred to Magistrate Judge Duffin for a hearing.

the fruits of an unreasonable cell phone search, (Docket #16). On May 13, 2020, Magistrate Judge William E. Duffin issued a Report and Recommendation ("R&R") in which he recommended denying the suppression motions, and deferred ruling on the *Daubert* motion to this Court. (Docket #27). The R&R was timely opposed, and is now fully briefed—the government has filed a motion to file a sur-reply, which the Court has considered and will grant. (Docket #35). For the reasons explained below, the Court adopts in part and overrules in part Magistrate Judge Duffin's R&R.

## 1.     LEGAL STANDARD

When reviewing a magistrate's recommendation, this Court is obliged to analyze de novo "those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). The Court can "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." *Id*. The Court's review encompasses both the magistrate's legal analysis and factual findings. *Id*.; *see also* Fed. R. Crim. P. 59(b).

## 2.     FACTUAL BACKGROUND

The facts are not contested, so the Court repeats them below in substantially the same form as they appear in Magistrate Judge Duffin's R&R, with occasional additions or modifications as needed. *See generally* (Docket #27 at 2–4).

On January 7, 2020, Milwaukee Police Officer Ryan DeWitt ("DeWitt") sought a "no-knock" search warrant for the premises located at 2236 North 16 Street in Milwaukee, which the warrant described as "occupied by 'John and Jane Doe.'" (Docket #11-1 at 1). Based on the affidavit, which was signed by DeWitt, Milwaukee County Court

Commissioner Barry Phillips approved the "no knock" search warrant, identifying the "objects of search" as:

1. Cocaine – a white powdery or an off-white chunky substance;

2. Firearms, ammunition, body armor, gun cases, manuals, cleaning kits

3. Scales, paper packets, plastic bags, aluminum foil and other items used to package cocaine/marijuana/heroin for sale; drug related paraphernalia, records, monies, firearms owned or associated with the premises;

4. Documents, utility bills, keys, and other items used to show who is in control of premises;

5. Cellular phones, computer, camera and/or laptop computers, and or any electronic device that would contain data;

6. Vehicles present on premise [sic] and associated with subjects present on premise [sic].

*Id*. The warrant closed by commanding the search of "the said premises and/or the said person(s) for said things, and take possession thereof, if found." *Id.*

DeWitt's affidavit relied on information obtained from a confidential informant. The informant had previously provided information that led to 13 felony drug arrests and four search warrants. (Docket #11-1 at 3). The informant was involved in more than ten controlled buys and had provided detailed information on residential and mobile drug dealings. *Id.* The informant had two misdemeanor convictions for disorderly conduct, and two felony drug convictions. *Id.* The informant's motivation for cooperating was "monetary payments." *Id.*

The affidavit noted four separate sources of information suggesting that drug dealing was occurring at the target property: an anonymous

citizen complaint within the last six months, *id.* at 4; a known citizen complaint within the last four weeks, *id.*; the affiant's own surveillance within the last seven days; and, most significantly, the informant's own tips, including the informant's observation of at least three sales of crack cocaine in the past three weeks, a controlled buy for crack cocaine within the past seven days, and two attempted controlled buys within the last seven days where each time a woman at the residence told the informant that they (it is unclear who "they" refers to) were out and would return in 30 or 60 minutes. *Id.* at 5–6. During the last of these attempted controlled buys the informant observed another person purchasing marijuana. *Id.* at 6. The informant also reported observing "a male subject at the door distributing narcotics while armed with a black handgun with an extended magazine." *Id.* at 4. There was a fairly thorough description of the woman involved in the deal, *id.* at 5, but no description of the male.

When officers executed the warrant on the morning of January 8, 2020, Stewart was at the residence with his sister and his sister's two-year old daughter. No fewer than twenty-five police officers stormed the house, setting off a "flare" in order to destabilize the occupants of the house. Stewart was promptly detained "on the mattress in a rear bedroom, and his sister was detained on a mattress in a makeshift bedroom in the dining room." (Docket #17 at 3). In the front-middle bedroom, the police discovered Stewart's jacket, which contained his identification card, his debit card, and a key to a car that was parked outside the residence and running. *Id.*[2] In the same room, the police discovered two smart phones on the mattress, as well as marijuana and powdered drugs located *in* the

---

[2]It is unclear how the car was running without keys in the ignition.

mattress, and firearms located in other areas of the room. The parties do not identify where the jacket was located in relation to the contraband, but it is clear that the jacket did not actually contain contraband.

While some members of the tactical unit searched the home, the other officers searched Stewart, discovering four grams of marijuana in his pants pocket. (Docket #11 at 2). Officers also found sandwich bags in the car that he was driving, and a .380 pistol in the heating register of the house. *Id.* In a post-arrest statement, Stewart acknowledged possessing the gun. *Id.*

## 3. ANALYSIS

### 3.1 Motion to Suppress Fruits of Invalid Search Warrant

#### 3.1.1 Validity of Search of Residence

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amen. IV. It requires searches to be conducted pursuant to a warrant, issued upon probable cause that a crime occurred. *Id.* The warrant must "particularly describe[e] the place to be searched, and the person or things to be seized." *Id.*

In determining whether an informant's tip provides probable cause to so support a search warrant, courts consider the totality of the circumstances surrounding the tip. *Illinois v. Gates*, 462 U.S. 213, 230–31 (1983). "When those 'known facts and circumstances' used to support a finding of probable cause are derived from a confidential informant's (CI) tip, the legitimacy of a probable cause determination turns on that 'CI's reliability, veracity and basis of knowledge.'" *United States v. Olson*, 408 F.3d 366, 370 (7th Cir. 2005) (quoting *United States v. Johnson*, 289 F.3d 1034, 1038 (7th Cir. 2002) (abrogated on other grounds)). Courts should consider whether the informant "(1) had firsthand knowledge; (2) provided

Page 5 of 21

sufficient details; (3) relayed information which was subsequently corroborated; and (4) testified at a probable cause hearing." *Id.*

In this case, the information from the confidential informant was sufficiently reliable, veritable, and based in knowledge. In the week leading up to the search, the CI participated in a controlled buy at the residence, and had observed three other buys occur over the prior three weeks, all of which gave him first-hand knowledge of the events unfolding. He had also tried, on two other occasions in the week leading up to the raid, to purchase crack cocaine, but was turned away by a woman at the door because they were "out" of the drug in question.[3] The CI described, in sufficient detail, the residence to be searched and the items that would be located there—i.e., he gave the address of the home, described the woman from whom he purchased the drugs, and described the drug paraphernalia that would be found therein. It should be noted, however, that he gave virtually no description of the people involved in the transaction.

The confidential informant's tips were confirmed by Officer DeWitt, who surveilled the home over the course of the week, observed the CI's buys and attempted buys, and took note of traffic in front of the home, which was consistent with drug trafficking. The record is silent as to whether the CI testified at a probable cause hearing, but his first-hand knowledge, well-established reputation for reliability, and the officer's corroboration of his information, all weigh in favor of finding that this CI's information was sufficient to support a probable cause determination. *See*

---

[3]Magistrate Judge Duffin explains: "'Out' did not mean they were 'out' of the drug dealing business. The statement [meant] to come back shortly." It is not clear how this fact was ascertained, but the defense does not dispute it. (Docket #27 at 7).

*Gates*, 462 U.S. at 230–31 (instructing a totality-of-circumstances analysis). The probable cause determination is buttressed by two citizen complaints, one that was four weeks old and one that was six months old, each of which complained about drug dealing at the residence. Taken together, the Court finds that the warrant was valid, and the search of the residence was constitutional.

### 3.1.2   Validity of Search of Vehicle

In his affidavit in support of the search warrant, Officer Dewitt stated that, in his experience, "controlled substances can be secreted in . . .vehicles on and associated with the premises." (Docket #11-1 at 6, ¶ 25). This is all that the warrant states as to the vehicle. Magistrate Judge Duffin rightly dismissed this as an utter failure to establish probable cause for the search of the vehicle, noting that "[i]t hardly takes any sort of training or experience to make such an observation." (Docket #27 at 9). Magistrate Judge Duffin correctly asserted that "[o]fficers are not authorized to search a location simply because it is capable of holding controlled substances; controlled substances can be secreted pretty much anywhere." *Id.* Giving law enforcement free reign to search anywhere that they believe drugs can be secreted is not what the Constitution permits. As Magistrate Judge Duffin concluded, the warrant did not allow the search of the car.

"[S]uppression of evidence seized pursuant to a search warrant that is later declared invalid is inappropriate if the officers who executed the warrant relied in good faith on the issuing judge's finding of probable cause." *United States v. Adams*, 934 F.3d 720, 726 (7th Cir. 2019) (quoting *United States v.* Watts, 535 F.3d 650, 656–57 (7th Cir. 2008)). Often, "[a]n officer's decision to obtain a warrant is prima facie evidence that the officer

Case 2:20-cr-00056-JPS-WED   Filed 10/23/20   Page 7 of 21   Document 38

was acting in good faith." *Id.* However, "[a] defendant can rebut this presumption in several ways, including by showing that 'the affidavit submitted in support of the warrant was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."'" *Id.* (citing *Olson,* 408 F.3d at 372) (internally quoting *United States v. Leon*, 468 U.S. 897, 924 (1984)).

"Overcoming the presumption of good faith is no small feat, as an officer cannot ordinarily be expected to question a judge's probable cause determination." *Id.* (quoting *United States v. Lickers*, 928 F.3d 609, 619 (7th Cir. 2019)). When a search is made "pursuant to a facially valid warrant issued by a judicial officer," the police violate a defendant's rights "only if reasonably well-trained officers in their positions should have known that the testimony or affidavits they provided in support of the warrants would have failed to establish probable cause, so that they should not have applied for the warrants in the first place." *Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 743 (7th Cir. 2003) (citing *Malley v. Briggs*, 475 U.S. 335, 345 (1986)). "In reviewing the validity of a search warrant supported by an affidavit containing information that is in part unlawfully obtained. . .we must consider whether the untainted information, considered by itself, establishes probable cause for the warrant to issue." *United States v. Johnson*, 876 F.2d 589, 592 (7th Cir. 1989) (citations and quotations omitted).

It is well established that officers must state with sufficient particularity the things to be searched. *Steele v. United States*, 267 U.S. 498, 503 (1925) (explaining that the particularity requirement is met if "the description is such that the officer with a search warrant can, with reasonable effort ascertain and identify the place intended."). This is an elementary legal principle that a reasonable law enforcement officer would

know he is required to apply—in fact, DeWitt described with sufficient particularity the residence to be searched, and the drug paraphernalia therein, which demonstrates his understanding of this elementary principle of search and seizure law. (Docket #11-1 at 1) (describing the "lower apartment of a two-story duplex with white colored siding, red and tan colored trim and a tannish colored shingled roof" with a west-facing entryway). DeWitt's reliance on the affidavit to search the car—which simply says "Vehicles present on premise and associated with subjects present on premise" without specifying whether "on premise" means a garage, driveway, or street—is patently unreasonable. *Id.* This is particularly true because Stewart's vehicle was parked on the street in front of the duplex—meaning it was not clearly "on the premises," as a car in a garage or a driveway might be. Without a single detail instructing an officer how to discern a searchable vehicle from a non-searchable vehicle, the affidavit as to the vehicles was obviously deficient.

In upholding the search under the good faith exception, Magistrate Judge Duffin observed that there was "nothing unusual" about searching vehicles at homes where search warrants are authorized and noted that courts "routinely" authorize such searches. (Docket #27 at 12). That may well be, but the officer must describe the things to be searched with *some* particularity—that is the entire point of the search warrant. What type of car? What color? Where would it have been parked? Any one of these details would have been sufficient; particularity is not a high bar, and there is no reason not to meet it. The Court is not looking for the VIN number, just some indication that the car being searched is actually implicated in the crime.

Case 2:20-cr-00056-JPS-WED   Filed 10/23/20   Page 9 of 21   Document 38

Officer DeWitt had been surveilling the home for a week—he had every opportunity to take note of suspicious vehicles, particularly ones that were regularly at the home and which he might need to search for evidence. But the affidavit does not contain a single indication that DeWitt knew that the vehicle he searched was his target's car, or otherwise likely to be a source of evidence. For these reasons, the good faith exception does not apply to the vehicle, and the items seized as a result of that search must be suppressed.

### 3.1.3 Validity of Search of Electronic Devices

The officers seized two phones, which were located in plain view. Obviously, cell phones are not inherently unlawful, but they are used in nearly all commercial endeavors, including the drug trade. *See* (Docket #27 at 13–14) (citing cases). Accordingly, the search warrant reasonably listed "cell phones" among the items intended to be seized. While the initial warrant did not describe the types of phones or the phone numbers that might have been linked to the phones, it did provide for the seizure of cell phones located at the residence. A subsequent warrant provided significantly more description about the phones, in order to ensure the propriety of the search.

The Court finds that the seizure of the cell phones was lawful, and the subsequent search supported by either warrant. The officers were permitted, by the terms of the first warrant, to enter the home and search for listed items used to effectuate the drug trade. These items included cell phones (i.e., more than one). The officers found the cell phones in an anonymous bedroom, which also contained other contraband. The officers had no reason to believe the phones belonged to Stewart (and thus not the target of the search, as explained below). Rather, the phones were on a bed,

in plain view, not on anybody's person or in the pocket of any person's article of clothing. It would be reasonable for officers, tasked with seizing cell phones located at the residence, to take the phones. Accordingly, the search of the phones was valid.

### 3.1.4   Validity of Search of Stewart

"[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979). Rather, an arrest is lawful only if "the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964). Magistrate Judge Duffin determined, and this Court agrees, that the warrant was insufficient to create probable cause to support a search of Stewart—it did not describe Stewart with any particularity, and courts have held that *John Doe* warrants are presumptively invalid. *United States v. Doe*, 703 F.2d 745, 747 (3d Cir. 1983); *West v. Cabell*, 153 U.S. 78 (1984) (holding that "warrants of arrest[,] in cases criminal or civil, must specifically name or describe the person to be arrested[.]").

The government contends that the search was a permissible search incident to a lawful arrest. Magistrate Judge Duffin determined that this argument was extremely weak, as well, (Docket #27 at 16), but ultimately concluded that, under the inevitable discovery doctrine—which revealed the jacket and the contraband in the room where the jacket was found— there would have been probable cause to arrest Stewart, thereby rendering the search incident to the lawful arrest constitutional. *Id.* at 19–20.

The inevitable discovery doctrine is an exception to the exclusionary rule that applies "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams*, 467 U.S. 431, 444 (1984). "To satisfy this burden, the [g]overnment must demonstrate that two criteria are met: First, it must show that it had, or would have obtained, an independent, legal justification for conducting a search that would have led to the discovery of the evidence; second, the [g]overnment must demonstrate that it would have conducted a lawful search absent the challenged conduct." *United States v. Marrocco*, 578 F.3d 627, 637–38 (7th Cir. 2009). At this second step, the government must "prove that a warrant would certainly, and not merely probably, have been issued had it been applied for." *United States v. Tejada*, 524 F.3d 809, 813 (7th Cir. 2008).

Here, "the information" that must "ultimately" have been discovered by "lawful means" is the drugs that were on Stewart's person during the time of the search. *See Nix*, 467 U.S. at 444. In order to demonstrate "an independent, legal justification for conducting [the search," the government must demonstrate that the search of the residence would have revealed probable cause to arrest—and thus, search—Stewart. *Marrocco*, 578 F.3d at 627–28. This requires the police to have independently discovered sufficient evidence implicating Stewart in the drug trade such that they would have "certainly" obtained a warrant to arrest him had they applied for it. *Tejada*, 524 F.3d at 813.

Since Stewart did not physically possess any of the contraband that the officers found in the home, they must have discovered some evidence linking Stewart to the contraband. "[W]hen the defendant jointly occupies a residence, proof of constructive possession of contraband in the residence

requires the government to demonstrate a 'substantial connection' between the defendant and the contraband itself, not just the residence." *United States v. Griffin*, 684 F.3d 691, 697 (7th Cir. 2012). To support an arrest for constructive possession, the government must show that the police would have independently discovered evidence demonstrating a "fair probability" that there was a "substantial connection" between Stewart and the contraband. *See Bridgewell v. Eberle*, 730 F.3d 672, 675 (7th Cir. 2013) ("[W]hen facts support a 'fair probability' that a suspect has committed a crime, probable cause to arrest exists.").

When the police executed the warrant, there was not even a substantial connection between him and the *residence*, let alone the contraband therein. The only evidence of Stewart's presence was fleeting: his car running outside, and his jacket tossed on a bed. There was no evidence that DeWitt had seen Stewart come and go from the residence during his seven-day surveillance of the home. The CI never described Stewart or a man like Stewart living at the home, keeping his possessions there, or facilitating the drug trade. There is no indication that the police found Stewart sleeping in the bed where his jacket was found. In short, when the police executed the warrant, they had no reason to believe that Stewart was anything other than a visitor.

And herein lies the logical flaw: if, at the time they executed the warrant, the police only had reason to believe that Stewart was a visitor to the home, then the fact that they found his recently-worn jacket in the same room that *also* contained contraband does not amount to a "fair probability" that he owned the contraband. An arrest for constructive possession would require probable cause that "the defendant knowingly had both the power and intention to exercise dominion and control over the object, either

Case 2:20-cr-00056-JPS-WED    Filed 10/23/20    Page 13 of 21    Document 38

directly or through others." *United States v. Lawrence*, 788 F.3d 234, 240 (7th Cir. 2015) (discussing sufficiency of evidence at trial). There is no evidence that the jacket was, for example, nestled atop or around a pile of the contraband. Nor does it seem that the police independently discovered any information suggesting that the room was Stewart's, and the contraband was possibly his—that, in the course of their search, the police discovered material possessions likely to belong to Stewart, or artifacts of life bearing Stewart's name, such that the *possibility* that he lived there and wielded control over the contraband could be entertained. Probable cause is not a demanding standard, but the government has not met it. The law does not permit the state to tear down the door of someone's house and search everyone therein. *See United States v. McCauley*, 659 F.3d 645, 649 (7th Cir. 2011).

Nor does the singular fact that Stewart was at a home where drugs were sold support probable cause for an arrest. There were not drugs out in the open in the common areas of the home, only paraphernalia like a baking sheet with powdery residue and a scale in the living room. (Docket #30-1 at 3–4). The drugs themselves were found in a safe in the basement, in the folds of mattresses, and in the target's purse—none of which obviously implicated Stewart. *Id.*

In *Ybarra v. Illinois*, the Supreme Court explained that the probable cause requirement "cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be." 444 U.S. 85, 92 (1979). *Ybarra* dealt with the search of a patron of a tavern suspected of hosting a heroin trade. The Seventh Circuit has since distinguished *Ybarra* from cases where police execute a search warrant on

a *home* drug dealing operation, but the caselaw is clear that a homeowner's trust in a visitor viewing the drugs does not, alone, support probable cause for an arrest of the visitor. *See United States v. Pace*, 898 F.2d 1218, 1240 (7th Cir. 1990) (finding probable cause to arrest visitors of a condo where police observed visitors moving between rooms that proved to contain large amount of drugs and money kept out in the open, and determined that the drug dealing owner of the condo trusted the defendants to do so); *United States v. Nelson*, 385 F. App'x 566, 569 (7th Cir. 2010) (finding probable cause to arrest a visitor in a home that contained drug paraphernalia, hosted drug transactions, lacked furnishings and running water, and "appeared to have no lawful purpose," combined with the fact that the home owner trusted the visitor to be in the home while active drug dealing occurred); *United States v. McCauley*, 659 F.3d 645, 649 (7th Cir. 2011) (finding probable cause to arrest for assault where the defendant matched the physical description of a person who had participated in an assault at that location).[4] *McCauley* went on to note that

> *Ybarra* might be instructive if, because the apartment [the informant] described was known as a drug house, [the police] had entered through some legitimate means (a search warrant, consent, or observation of drugs in plain sight), and then proceeded to indiscriminately search everyone in the apartment.

*Id.* But the court explained that those were not the facts of that case. *Id.* They are, however, the facts of this case.

---

[4]While the police were purportedly investigating a shooting that was reported "outside" of the residence the previous day, there is no description of the people involved in the shooting—much less any indication that the shooters were residents of the duplex in question.

Indeed, *Pace, Nelson,* and *McCauley* illustrate that while a homeowner's willingness to leave a visitor in the presence of drugs is a factor in establishing probable cause to arrest, it, alone, does not support probable cause. There is always something else—a police observation of the defendants moving purposefully between rooms containing the drugs and cash (*Pace*), an utter lack of any other reason to be in the dwelling (*Nelson*), or independent probable cause for an arrest based on an earlier reported crime at that location (*McCauley*). The Court is not aware of any case that permits law enforcement to enter a dwelling through legitimate means and "proceed[] to indiscriminately search [or arrest] everyone in the apartment." *McCauley*, 569 F.3d at 649. And this is the most reasonable application of law—otherwise, the line of cases regarding constructive possession of contraband in a shared dwelling would have no use. *See e.g.,* *Lawrence*, 788 F.3d at 240.

In this case, the visitor was not even in the presence of drugs—there was drug paraphernalia in the living room which, but for the razors, could just as well have been a baking endeavor. And the fact that the visitor was a sibling suggests even less reason to conclude that the homeowner's trust in leaving the drug *paraphernalia* in front of him derived from his complicity in the drug dealing. The sister may simply have trusted her brother, as family members do. The home was also, apparently, used as a residence for a mother and her child, meaning Stewart's presence there was not necessarily nefarious. The government has not pointed to any other factor that might give the police reason to believe that Stewart was living at the residence, much less involved in the drug trafficking enterprise, aside from the fact that he happened to be there when the warrant was executed, and that prior drug transactions had, occasionally, featured a man with a gun

Case 2:20-cr-00056-JPS-WED   Filed 10/23/20   Page 16 of 21   Document 38

(who turned out to be a person named "Poochie" who lived in the basement, and not Stewart). *See* (Docket #30-1 at 6).

In short, the government has presented no basis to conclude that there was probable cause to arrest Stewart, thereby rendering the search incident to that arrest unconstitutional. The government has a low burden, and they have not met it; not even close. In retrospect—with the benefit of Stewart's confession and his description of his living situation—it appears that there *could* have been probable cause to arrest Stewart. But coulda woulda shoulda is not an exception to the Fourth Amendment. The inevitable discovery doctrine does not help the government here, and the constitutional inquiry is not retrospective. The search of Stewart must be suppressed.

### 3.1.5 Validity of Confession

"The burden of proving admissibility of a confession that follows from a Fourth Amendment violation rests with the prosecution." *United States v. Patino*, 830 F.3d 1413, 1418 (7th Cir. 1987). "The fact that a *Miranda* warning was given and understood is not conclusive and 'a finding of "voluntariness" for purposes of the Fifth Amendment is merely a threshold requirement for Fourth Amendment analysis.'" *Id.* (quoting *Taylor v. Alabama*, 457 U.S. 687, 690 (1982)). Courts must also consider "the temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct." *United States v. Brown*, 422 U.S. 590, 603–04 (1975).

The parties contest voluntariness in light of the defendant's inebriated state, the police officers' untruthful interrogation tactics, and the defendant's history with law enforcement. This is a close call, though the video of the interrogation suggests that the confession was voluntary.

However, even if the Court were to assume that the confession was voluntary, it would still be inadmissible because it was not sufficiently attenuated from the unconstitutional arrest.

One of the seminal cases on this issue proves instructive. In *Brown v. Illinois*, the police arrested the defendant, Brown, on suspicion of murder. 422 U.S. at 593. Brown had been identified as an acquaintance of the deceased, and, at around 5:00 p.m., the police executed an unlawful search of Brown apartment. *Id.* During their search, Brown came home. *Id.* The police stopped Brown at gunpoint, told him he was under arrest, confirmed that he had no weapon, and asked him his name. *Id.* Brown lied about his identity, and was placed in handcuffs. *Id.*

Brown was driven to the police station, whereupon he was given his *Miranda* rights in full, and appeared to understand them. *Id.* at 594. Thereafter, at around 8:45 p.m., he made several incriminating statements. *Id.* Specifically, Brown implicated another man, Claggett, in the murder. *Id.* at 595. At that point, the questioning stopped, and the police and Brown went out to search for and arrest Claggett. *Id.* They were successful, and resumed questioning Brown at around 2 a.m., after giving him some coffee. *Id.* Brown received his *Miranda* warnings again before the second round of questioning, and then again when the court reporter arrived, at around 2:30 a.m. *Id.* Brown made more incriminating statements, but refused to sign the statement that was ultimately produced. *Id.* at 595–96.

The Supreme Court held that both of Brown's statements had to be suppressed. The Court explained that when a person is arrested without probable case, "Miranda warnings, alone and per se, cannot always make the act sufficiently a product of free will [or] break, for Fourth Amendment purposes, the causal connection between the illegality and the confession."

*Id.* at 603. Rather, "[t]he question whether a confession is the product of a free will . . . must be answered on the facts of each case." *Id.* at 603.

In *Brown*, the Supreme Court found no attenuation under the following circumstances: (1) Miranda rights were given before each round of questioning; (2) defendant was questioned within an hour and again at six or seven hours after the arrest; (3) there was a four-and-a-half period of intervening time between the first and second interrogation in which Brown went with the police to search for the other suspect and then was left alone in an interrogation room for a couple of hours to drink coffee; and (4) where the purpose of the arrests was investigatory, and the manner in which he was originally arrested was calculated to "cause surprise, fright, and confusion." *Id.* at 605.

Like Brown, Stewart received his Miranda rights and purported to understand them. He was arrested at approximately 9:10 a.m., *see* (Docket #30-1 at 1), and questioned for a brief period of time between 11:20 a.m. and 12:26 p.m. There are no facts regarding how he spent the intervening time between the arrest and questioning, but it can be inferred that Stewart was in custody, and spent his time in jail or under the eyes of the police. He did not leave on his own recognizance, and then return on his own free will several days later to give a statement, as might have sufficiently attenuated the tainted arrest. *Wong Sun v. United States*, 371 U.S. 471, 491 (1963). Moreover, the purpose of the interrogation was investigatory—the officers explained that they were investigating a shooting that occurred, as well as the drug sales from the property. Like Brown, the manner in which Stewart was arrested—in the morning, no-knock, with a flash-bomb, amid a 25-officer house raid—gives the appearance of having been "calculated to cause surprise, fright, and confusion." *Brown*, 422 U.S. at 605. Thus, there is

no attenuation of the taint, and Stewart's confession must be suppressed. *Taylor*, 457 U.S. at 691 (excluding confession where there was a six-hour period between the illegal arrest and the confession; defendant was detained without counsel the entire time; defendant received *Miranda* warnings three times, and defendant was permitted to speak with his girlfriend and a friend before confessing).

**4.    CONCLUSION**

It appears that employing a platoon of officers to execute a no-knock warrant does not always give rise to the most precise execution of that which the law requires. Searches and arrests must be constitutional. It does not matter if the people in the residence are suspected of dealing drugs. If the Constitution does not apply to everybody in equal measure, it then becomes meaningless.

When the state rouses a household to search its people and their cars, our laws require the state to have probable cause for each search. The warrant did not extend to the people and the cars that were searched, and the government has utterly failed to demonstrate that probable cause otherwise existed. Not every set of facts merits application of the good faith exception or an exception to the exclusionary rule, and blind application of these exceptions only fosters shoddy law enforcement.

Accordingly,

**IT IS ORDERED** that Defendant's request for a Daubert hearing (Docket #10) be and the same is hereby **GRANTED**; this matter be and the same is hereby **REFERRED** to Magistrate Judge Duffin for further proceedings;

**IT IS FURTHER ORDERED** that Defendant's motion to suppress fruits of invalid search warrant (Docket #11) is **GRANTED in part and DENIED in part**;

**IT IS FURTHER ORDERED** that Defendant's motion to suppress his statements (Docket #12) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Defendant's motion to suppress fruits of an unreasonable cell phone search (Docket #16) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that the Magistrate Judge's Report and Recommendation (Docket #27) be and the same is hereby **ADOPTED in part and OVERRULED in part** as stated in the terms of this Order; and

**IT IS FURTHER ORDERED** that the government's motion for leave to file a sur-reply (Docket #35) be and the same is hereby **GRANTED**.

Dated at Milwaukee, Wisconsin, this 23rd day of October, 2020.

BY THE COURT:

_____

J.P. Stadtmueller
U.S. District Judge